IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DAVID J. ROBERTS,<br><br>　　　　Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN,<br>Commissioner of Social Security,<br><br>　　　　Defendant. | **MEMORANDUM DECISION<br>AND ORDER**<br><br><br><br>Case No. 2:10-cv-01032-EJF<br><br>Magistrate Judge Evelyn J. Furse |

　　　　Plaintiff David J. Roberts filed this action asking the Court to reverse or remand the final

agency decision denying him Disability Insurance Benefits ("DIB") under Title II of the Social

Security Act, *see* 42 U.S.C. §§ 401-434 (2010).[1]  Based on the Court's careful consideration of

the record, the parties' memoranda, and relevant legal authorities, the Court AFFIRMS the

Commissioner's decision.[2]

## FACTUAL AND PROCEDURAL HISTORY

　　　　In May 2007, Mr. Roberts filed for DIB alleging an onset date of disability of February

11, 2007.  (Admin. R. Doc. 16, certified copy tr. of R. of admin. proceedings: David J. Roberts

(hereinafter "Tr. __").)  The Regional Commissioner denied Mr. Roberts's claim on August 7,

2007, (Tr. 85), and upon reconsideration on December 12, 2007.  (Tr. 89-91.)  Mr. Roberts

---

　　　　[1]  On September 27, 2011, in acco rdance with 28 U.S.C. s ections 636(c)(1) and (3 ) and
Federal Rule of Civil Procedure 73 , the p arties consented to proceed before Magistrate Judge
David Nuffer. ( *See* Docket No. 17.) On July 11, 2012,    this case was reassigned to the
undersigned Magistrate Judge.  (*See* Docket No. 26.)
　　　　[2]  Pursuant to Civil Rule 7-  1(f) of the Rules  of Practice for th e United States Dis trict
Court for the District of Utah, the  Court conc ludes it doe s not n eed oral argument and will
determine the appeal on the basis of the written memoranda.

requested a hearing before an Administrative Law Judge ("ALJ") that took place on March 12, 2009.  (Tr. 16.)  The ALJ issued a decision on November 16, 2009, finding Mr. Roberts did not qualify as disabled within the meaning of the Social Security Act.  (Tr. 16-29.)  The Appeals Council denied Mr. Roberts's request for review on August 25, 2010, (Tr. 1-3), making the ALJ's decision the Commissioner's final decision for purposes of judicial review under 42 U.S.C. section 405(g).  *See* 20 C.F.R. § 404.981.

On February 10, 2007, an ambulance transported Mr. Roberts from his home in Salinas, Utah, to Gunnison Valley Hospital ("GVH") after he complained of severe pain in his back that caused him to fall.  (Tr. 388.)  When Mr. Roberts arrived at GVH he explained to Jan F. Christensen, M.D., that his pain had started ten years prior, and he had no recent trauma to his back.  *Id*.  Dr. Christensen consulted with Lynn Gaufin, M.D., and they decided to transfer Mr. Roberts immediately to Utah Valley Regional Medical Center ("UVRMC") in Provo, Utah.  (Tr. 389, 394.)  UVRMC conducted a magnetic resonance image ("MRI") of Mr. Roberts's back, and Dr. Gaufin found Mr. Roberts had a massive herniated disc, shallow disc protrusion, and a congenitally narrowed spine.  (Tr. 394.)  On February 11, Dr. Gaufin performed a lumbar laminotomy, a foraminotomy, a nerve root decompression, and a discectomy L4-5 bilaterally on Mr. Roberts and discharged him from UVRMC on February 13.  (Tr. 394-95.)  On March 7, Mr. Roberts visited his primary care physician, Kerry A. Blackham, D.O., complaining he had become increasingly depressed since the surgery.  (Tr. 447.)  Dr. Blackham gave him Cymbalta samples instructing him to follow up in one month.  (*Id*.)

On March 14, 2007, Mr. Roberts had another MRI of his back.  (Tr. 387.)  Dr. Gaufin then reviewed the MRI and examined Mr. Roberts on March 19, noting Mr. Roberts may require another operation on his back depending on the outcome of further testing.  (Tr. 423-24.)  On

April 11, Dr. Gaufin advised Mr. Roberts that he would need another surgery because the non-operative programs used after his first surgery had not reduced his pain sufficiently.  (Tr. 421-22.)  On April 24, Dr. Gaufin reoperated on Mr. Roberts's back performing a lumbar laminotomy, a foraminotomy, a nerve root decompression, a discectomy at L3-4 and 4-5 bilaterally, a transforaminal lumbar interbody fusion at L3-4 and 4-5 with "Peak"[3] and autograft, a transverse process lateral mass fusion at right L3-4 with autograft, and a Xia pedicle fixation at L3-4-5 bilaterally.  (Tr. 407-10.)  Three days later, UVRMC discharged Mr. Roberts in satisfactory condition.  (Tr. 391-92.)

On May 23, 2007, Mr. Roberts visited Dr. Gaufin and Matthew J. Badger, F.N.P., who found that Mr. Roberts had done well since the second surgery, walked a mile to a mile and half every day, and spent some time walking in a pool regularly.  (Tr. 420.)  An x-ray from that same day of Mr. Roberts's back showed no acute complication or other significant abnormality.  (Tr. 426.)  Dr. Gaufin suggested Mr. Roberts start physical therapy ten weeks after the visit and perform no heavy lifting, bending, or twisting.  (Tr. 420.)

Because of hip pain, Mr. Roberts had an x-ray of his hip on June 11, but the x-ray showed no abnormalities in Mr. Roberts's pelvis or hip.  (Tr. 425.)  On August 1, another lumbar x-ray showed the two-level lumbar fusion had a stable appearance, and Dr. Gaufin noted Mr. Roberts had done well since his surgery.  (Tr. 461, 464.)  However, a thorasic MRI showed a new herniation at T4-5 and 5-6.  (Tr. 461.)  Dr. Gaufin recommended non-operative techniques, including physical therapy, to improve the herniation.  (*Id*.)

---

[3]  The medical record of Mr. Roberts's operation refers to "Peak," which the Court understands to mean polyetheretherketone or "PEEK."

Mr. Roberts's physical therapist, Dallas Overly, M.P.T., noted on September 19, 2007, that Mr. Roberts had complied with his physical therapy routine, which addressed both the lumbar and thorasic issues, but his progress had plateaued.  (Tr. 438.)  By this time, an MRI of his cervical spine showed bulging discs.  (Tr. 463, 459.)  Mr. Overly also opined that Mr. Roberts could not return to work as a truck driver because vibrations of the truck and sitting for extended periods of time would increase his pain and cause his condition to deteriorate.  (Tr. 438.)  On October 10, Dr. Gaufin agreed with Mr. Overly's assessment and advised Mr. Roberts his pain could be managed—not cured—and in six months he should consider removing the screws placed in his back during the second surgery to relieve some of the pain.  (Tr. 459-60.)  Dr. Gaufin recommended against surgery in the neck and referred Mr. Roberts to a different doctor for an opinion on his thoracic issue.  (*Id.*)

At that time, Dr. Gaufin also noted that Mr. Roberts was taking several antidepressants.  (*Id.*)  On November 28, Mr. Roberts began meeting weekly with David B. Jensen, licensed clinical social worker, but the record does not elucidate what event if any led Mr. Roberts to start meeting with Mr. Jensen.[4]  (*See* Tr. 479-83.)

On December 7, Mr. Roberts met with pain specialist Gordon P. George, M.D., for a follow-up evaluation and consultation.[5]  (Tr. 485-88.)  Dr. George found Mr. Roberts continued

---

[4]  The only information in the record about  Mr. Jensen's treatment of Mr. Roberts is a questionnaire  Mr. Jensen completed at Mr. Roberts's request. (      *See*  Tr. 479-83.)  The questionnaire contains Mr. Jensen's general assessment of Mr. Roberts's mental health, how his mental health affects his ability to work, and  the treatment he provided to Mr. Roberts.  However, the questionnaire does not explain what caused Mr. Roberts to begin meeting with Mr. Jensen, how frequently they met, what symptoms Mr. Roberts exhibited,  or what progress Mr. Roberts made,  though clearly Mr. Roberts spoke to Mr. Jensen  about feeling depressed and suicidal. (*Id.*)

[5]  Mr. Roberts also appears to have met with Dr. George on November 8, 2007, but the record does not contain a summary of that evaluation.  (*See* Tr. 485.)

to have significant pathophysiologic disease but was "functioning much better" in relation to his depressive symptoms and was "receiving good psychological support." (*Id*.)  Dr. George also found the condition of Mr. Roberts's neck and back had "modestly improved" and that he "[a]ppears to be in overall good general health."  (Tr. 487-88.)

On January 10, 2008, Mr. Roberts requested a refill of Trazedone and a stronger dose of Effexor from the North Sevier Clinic (the "Clinic") because "he ha[d] become suicidal."  (Tr. 538.)  The Clinic noted "[Mr. Roberts] has gone to therapy this week . . . and is doing better today," and later that day Dr. Blackham filled Mr. Roberts's prescriptions.  (*Id*.)  Following an automobile collision on January 11, 2008, Mr. Roberts visited Dr. Blackham on January 17, complaining of neck pain and burning on his left side.  (Tr. 536.)  Dr. Blackham examined Mr. Roberts and found muscle spasm in his paraspinous muscles, limited range of motion in his neck, full range of motion in his arms, and normal strength, reflexes, and sensation.  (*Id*.)  Dr. Blackham instructed Mr. Roberts to return in a week if his condition did not improve.  (*Id*.)  On February 19, Mr. Roberts stopped meeting weekly with his social worker, Mr. Jensen.[6]  (*See*  Tr. 479-83.)

On June 12, 2008, Mr. Roberts visited Dr. Blackham to have his weight and the dizziness he experienced checked, and to consult on his "SS paperwork." [7]  (Tr. 530-31.)  Dr. Blackham examined Mr. Roberts and found he had muscle spasm and limited range of motion in his back, normal strength, decreased reflexes, decreased sensation in his legs, and a negative straight leg raise test.  (*Id*.)  On July 1, Mr. Roberts visited Dr. Blackham complaining of severe pain on the

---

[6]  The questionnaire Mr. Jensen completed   does  not explain why he and Mr. Roberts stopped meeting.  *See supra* note 4.

[7]  The medical record of this visit does not   explain what the "SS paperwork" is, but Dr. Blackham does note "[ Mr. Roberts] refused the SS and needs [  the SS paperwork]  filled out indicating why he didn't need [the SS]."  (Tr. 530-31.)

right side of his back that started as he was getting ready for work.  (Tr. 528.)  Dr. Blackham

examined Mr. Roberts and found his condition unchanged except he had normal reflexes, normal

sensation in his legs, and a positive straight leg raise test.  (*Id*.)  Mr. Roberts had a follow-up visit

with Dr. Blackham on July 17, and Dr. Blackham found Mr. Roberts's condition the same as on

July 1, except he had normal reflexes and a negative straight leg raise test.  (Tr. 527.)  A July 18

computed tomography ("CT") scan of Mr. Roberts's lumbar spine showed a satisfactory

postoperative appearance, (Tr. 525-26), and Dr. Blackham determined the CT scan showed Mr.

Roberts's back was normal other than surgical changes.  (Tr. 524.)  On August 26, Mr. Roberts

visited the Clinic to have Dr. Blackham complete disability paperwork[8] and to request a

cortisone injection for his back.  (Tr. 521.)  Dr. Blackham prescribed Naprosyn but did not give

Mr. Roberts a cortisone injection.  (*Id*.)  Dr. Blackham found Mr. Roberts's condition had not

changed except for a positive straight leg raise test.  (*Id*.)  In November 2008, Mr. Roberts again

began to meet weekly with his social worker, Mr. Jensen.  (*See* Tr. 479-83.)  On December 18,

2008, Mr. Jensen said Mr. Roberts "initially responded favorably" to cognitive methods but that

his depression and "suicidal ideation" returned, and that "suicidal ideation, memory loss,

insomnia, [l]ack of interest in hobbies, [and] withdrawal [and] isolation" continued to impair Mr.

Roberts's "ability to maintain employment."  (*Id*.)

    On January 27, 2009, Mr. Roberts visited the Clinic but saw a different doctor—Dr.

Kevin Anderson—complaining of severe back pain, restless legs, and insomnia.  (Tr. 494.)  An

x-ray of his back showed nothing out of the ordinary.[9]  (Tr. 498-99.)  Dr. Anderson instructed

---

    [8]  The paperwork Mr. Roberts asked Dr. Blackham to complete consisted of an evaluation
form  that requested  Dr. Blac  kham  provide his m edical  opinion  as  to Mr. Roberts's physical
ability to do work-related activities based on Mr. Roberts's medical history.  (*See* Tr. 474-77.)
    [9]  The Radiologists' records reflect that Mr. Roberts slipped on ice two weeks earlier.

Mr. Roberts to follow up if the symptoms persisted.  (Tr. 495.)  Mr. Roberts visited Dr.

Blackham on February 10, because he had a "very painful and tender" lump on his back.  (Tr.

491.)  Dr. Blackham examined Mr. Roberts and found his condition had not changed except for a

two centimeter mass located on the left of his mid thoracic spine, which caused Dr. Blackham to

order a CT scan of Mr. Roberts's thoracic spine.  (Tr. 491-92.)  Dr. Blackham found the CT scan

was unremarkable, (Tr. 491), and the next day requested an appointment be scheduled with a Dr.

Allen to have Mr. Roberts's lump removed.  (Tr. 490.)

On April 27, Mr. Roberts visited Dr. Blackham complaining of arm and hip pain.  (Tr.

572.)  Dr. Blackham gave Mr. Roberts a trigger point injection in his right lower back for his

continued pain and found Mr. Roberts had muscle spasm in his paraspinous muscles, limited

range of motion, normal strength, normal reflexes, normal sensation in his legs, and a negative

straight leg raise test.  (*Id.*)  On June 9, Mr. Roberts consulted Dr. Blackham on his back pain

and complained of neck pain and frequent migraine headaches but Dr. Blackham found Mr.

Roberts's condition had not changed except for a positive straight leg raise test.  (Tr. 569.)  On

June 30, Mr. Roberts complained to Dr. Blackham that he felt depressed, and Dr. Blackham

noted "[he] [h]as been on numerous antidepressants with little change."  (Tr. 566.)  Dr.

Blackham prescribed a daily dose of Symbyax and told Mr. Roberts to follow up in one month.

(*Id.*)

At the administrative hearing, Mr. Roberts was thirty-seven years old and had last

worked part time for The Parts House through at least November 5, 2008, (Tr. 260), but earnings

from this job did not constitute substantial gainful activity.  (Tr. 18.)  Mr. Roberts began working

as a truck driver for Barney Trucking in 2001, (Tr. 202, 211), but could not work after his

February 11, 2007 surgery and received short-term disability from Barney Trucking through

August, 18, 2007.  (Tr. 191-94.)  Prior to working for Barney Trucking, Mr. Roberts worked as a foreman at Cleggs Roofing from 1990 to 1991, (Tr. 211), a carpet installer at Jones Glass from 1991 or 1992 to 1996, and a delivery truck driver at Birrel Bottling from 1996 or 1997 to 2001. (Tr. 202, 211)

After the administrative hearing the ALJ secured interrogatory responses from two additional medical sources.  (*See* Tr. 277, 284.)   The ALJ sent the medical source interrogatory responses to Mr. Roberts on July 14, 2009, and deemed the interrogatory responses admitted into evidence without objection after Mr. Roberts did not respond within fourteen days after the date of the ALJ's letter.  (Tr. 277.)  Michael F. Enright, Ph.D., the first additional medical source, responded to interrogatories from the ALJ requesting he analyze Mr. Roberts's mental health based on the medical evidence in the record.  (*See* Tr. 539-44.)  Dr. Enright found Mr. Roberts did have mental impairments but that those impairments did not meet or equal a listed impairment.  (*Id*.)  Kendrick O. Morrison, M.D., the second additional medical source, responded to similar interrogatories from the ALJ asking him to analyze Mr. Roberts's physical health.  (*See* Tr. 545-65.)  Dr. Morrison found Mr. Roberts did not meet or equal a listed impairment for the required durational period but did have some functional limitations that affect his ability to work.  (*Id*.)

The ALJ also sent a copy of an interrogatory response she received from vocational expert Dina Galli to Mr. Roberts on August 13, 2009.  (Tr. 284.)  Mr. Roberts objected to the hypotheticals in the interrogatory because they were not based on the opinions of Dr. Blackham and Mr. Jensen.  (Tr. 285-86.)  Ms. Galli found Mr. Roberts could not perform any of his past work but could perform other jobs in the national or regional economy.  (*Id*.)

## STANDARD OF REVIEW

42 U.S.C. section 405(g) provides for judicial review of a final decision of the Commissioner of the Social Security Administration ("SSA").  The Court reviews the Commissioner's decision to determine whether the record as a whole contains substantial evidence in support of the Commissioner's factual findings and whether the SSA applied the correct legal standards.  42 U.S.C. §405(g); *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).  The Commissioner's findings shall stand if supported by substantial evidence.  42 U.S.C. § 405(g).

Adequate, relevant evidence that a reasonable mind might accept to support a conclusion constitutes substantial evidence, and "[e]vidence is insubstantial if it is overwhelmingly contradicted by other evidence."  *O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir. 1994).  The standard "requires more than a scintilla, but less than a preponderance."  *Lax*, 489 F.3d at 1084.  "Evidence is not substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion."  *Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir. 1988) (internal quotations marks and citations omitted).  Moreover, "[a] finding of 'no substantial evidence' will be found only where there is a conspicuous absence of credible choices or no contrary medical evidence."  *Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir. 1992) (internal quotation marks and citations omitted).

Although the reviewing court considers "whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases," the court "will not reweigh the evidence or substitute [its] judgment for the Commissioner's," *Lax*, 489 F.3d at 1084 (internal quotation marks and citations omitted), but "review only the *sufficiency* of

9

the evidence," *Oldham v. Astrue,* 509 F.3d 1254, 1257 (10th Cir. 2007) (emphasis in original).

The court does not have to accept the Commissioner's findings mechanically, but "examine the

record as a whole, including whatever in the record fairly detracts from the weight of the

[Commissioner's] decision and, on that basis, determine if the substantiality of the evidence test

has been met." *Glenn v. Shalala*, 21 F.3d 983, 984 (10th Cir. 1994) (internal quotation marks

and citation omitted).  "'The possibility of drawing two inconsistent conclusions from the

evidence does not prevent an administrative agency's findings from being supported by

substantial evidence,'" and the court may not "'displace the agenc[y's] choice between two fairly

conflicting views, even though the court would justifiably have made a different choice had the

matter been before it de novo.'"  *Lax*, 489 F.3d at 1084 (quoting *Zoltanski v. FAA*, 372 F.3d

1195, 1200 (10th Cir. 2004)).

     In addition to a lack of substantial evidence, the Court may reverse where the

Commission uses the wrong legal standards or the Commissioner fails to demonstrate reliance on

the correct legal standards.  *See Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994); *Thomson*

*v. Sullivan*; 987 F.2d 1482, 1487 (10th Cir. 1993); *Andrade v. Sec'y of Health & Human Servs.*,

985 F.2d 1045, 1047 (10th Cir. 1993).

## ANALYSIS

     The Social Security Act ("Act") defines "disability" as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Moreover,

the Act considers an individual disabled "only if his physical or mental impairment or

impairments are of such severity that he is not only unable to do his previous work but cannot,

considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id.* § 423(d)(2)(A).

 In determining whether a claimant qualifies as disabled within the meaning of the Act, the SSA employs a five-part sequential evaluation.  *See* 20 C.F.R. § 404.1520; *Williams v. Bowen*, 844 F.2d 748, 750-53 (10th Cir. 1988); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  The analysis evaluates whether:

(1) The claimant presently engages in substantial gainful activity;
(2) The claimant has a medically severe physical or mental impairment or impairments;
(3) The impairment is equivalent to one of the impairments listed in the appendix of the relevant disability regulation which preclude substantial gainful activity;
(4) The impairment prevents the claimant from performing his or her past work; and
(5) The claimant possesses a residual functional capacity to perform other work in the national economy considering his or her age, education, and work experience.

*See* 20 C.F.R. § 404.1520.  The claimant has the initial burden of establishing the disability in the first four steps.  *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir. 1989).  At step five, the burden shifts to the Commissioner to show the claimant retains the ability to perform other work existing in the national economy.  *Id.*

The ALJ continued to evaluate Mr. Roberts's claim through step five, making the following findings of fact and conclusions of law with respect to Mr. Roberts:

1. "[Mr. Roberts] meets the insured status requirements of the Social Security Act through December 31, 2012."  (Tr. 18.)
2. "[Mr. Roberts] has not engaged in    substantial gainful activity since February 11, 2007, the alleged onset date (20 C.F.R. 404.1571 *et seq.*)." [10] (Tr. 18.)
3. "[Mr. Roberts] has the following seve re impairments: degenerative dis c disease of the lum bar spine, status-post L3-4 and L4-5 fusions;

_____

[10]  The reco rd does not clearly set forth Mr. Roberts's employment history, and the A LJ provided only a brief discussion of this issue in her opinion.  However, Mr. Roberts does not challenge this portion of the ALJ's decision.

degenerative disc disease of the cervical and th oracic spines; and reactive depression (20 C.F.R. 404.1520(c)).”  (Tr. 19.)

4. “[Mr.  Roberts] does not have an          impairment  or com bination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, (20 C.F.R. 404.1520(d), 404.1525 and 404.1526).”  (Tr. 19.)

5. “[Mr. Roberts] has the residual func  tional capacity to per form  medium work as defined in 20 C .F.R. 404.1567(c) except frequently carrying and lifting up to 10 pounds; a sit-stand option  at will; avoiding all exposure to unprotected heights, to rough or uneven surfaces and to ladders, ropes and scaffolds:  avoiding even moderate          exposure to climbing stairs; “occasional” (up to 1/3 of the workda y) exposure to moving mechanical parts, operating a m otor  vehicle and vibration; and with “m  ild” (slight limitation but generally able to functi on well) limitation in understanding, remembering and carrying out detailed instructions, making judgments on complex work-related decisions, interacting appropriately with supervisors and co-workers, and responding appropriately to usual work situations and to changes in the work setting.”  (Tr. 20.)

6. “[Mr.  Roberts] is unable to perform    any past relevant work (20 C.F.R. 404.1565).”  (Tr. 27.)

7. “[Mr.  Roberts] was born on December 13, 1971 and was 35 years old, which  is defined as a younger i    ndividual age 18-49, on the alleged disability onset date (20 C.F.R. 404.1563).”  (Tr. 27.)

8. “[Mr.  Roberts] has at least a high        school  education and is able to communicate in English (20 C.F.R. 404.1564).”  (Tr. 27.)

9. “Transferability  of  job  skills is n  ot  material  to the de  termination of disability  because using  the  Medical -Vocational  Rules  as a fram ework supports a finding that [Mr. Roberts] is ‘not disabled,’ whether or not [Mr. Roberts] has transferab le job skills ( *See* SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).”  (Tr. 27.)

10. “Considering [Mr. Roberts’s] age, education, work experience, and [RFC], there  are jobs that exis t in significant num bers in the national econom y that  [Mr. Roberts] can perfor m (20 C.F.R. 404.1569 and 404.1569(a).” (Tr. 27.)

11. “[Mr.  Roberts] has not been under a di   sability, as define d in the Social Security Act from February 11, 2007 th rough the date of this decision (20 C.F.R. 404.1520(g)).”  (Tr. 28.)

    In short, the ALJ concluded that Mr. Roberts did not possess an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, that he had the residual functional capacity to perform a limited range of light, unskilled work, and that he did not qualify as disabled as defined in the

Act from February 11, 2007, the alleged onset date, through the date of the ALJ decision.  (Tr. 19-20, 28.)

In support of his claim that this Court should reverse the Commissioner's decision, Mr. Roberts argues the ALJ erred: (1) by failing to evaluate the opinion of a treating physician properly; (2) by failing to determine Mr. Roberts's RFC properly; (3) by failing to adequately explain and support with substantial evidence her finding that Mr. Roberts did not meet a listing; and (4) by failing to evaluate properly the opinion of a medical source who is not an acceptable medical source.  The Court addresses each argument in turn.

## I.      Evaluation of Treating Physician Opinion Evidence

Mr. Roberts argues the ALJ erred when she did not assign controlling weight to the opinion of his treating physician, Dr. Blackham.  He argues the ALJ relied more heavily on the opinion of Dr. Morrison without properly explaining why and that the ALJ "cherry pick[ed] the evidence" that best supports her opinion.  (Pl.'s Opening Br. 10-11.)

When evaluating a treating physician's medical opinion, the ALJ must complete a two-step analysis.  *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011).  At the first step the ALJ must determine whether to give controlling weight to the treating physician's medical opinion. *Id.* (citation omitted)*.*  The ALJ should accord the opinion controlling weight "if it is well-supported by medically acceptable clinical or laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record."  *Id.*  However, deficiency at step one does not automatically mean the ALJ should reject the opinion.  *Id.* (citing SSR 96-2P).  The second step requires the ALJ to explain clearly how much weight she gives to the opinion using factors provided in the regulations.  *Id.* at 1330-31.  20 C.F.R. section 404.1527(c) provides the factors the ALJ must consider at step two:  "(1) the length of the treatment relationship and the

frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the" relevant evidence supports the physician's opinion; "(4) consistency between the opinion and the record as a whole; (5) whether" the physician specializes in the area upon which s/he renders an opinion; and "(6) other factors brought to the ALJ's attention [that] tend to support or contradict the opinion." *See Watkins v. Barnhart*, 350 F.3d 1297, 1300-01 (10th Cir. 2003). While the ALJ must explain the weight given to the opinion, the ALJ's decision need only be "'sufficiently specific to make clear to any subsequent reviewers the weight [she] gave to the treating source's medical opinion and the reason for that weight.'" *Krauser*, 638 F.3d at 1331 (quoting *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004)).

Moreover, the ALJ's decision need not *discuss explicitly* all of the factors for each of the medical opinions. *See Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (stating that a lack of discussion of each factor does not prevent the court from according the decision meaningful review). When considering medical opinion evidence, the ALJ must weigh and resolve evidentiary conflicts and inconsistencies. *See, e.g., Eggleston v. Bowen,* 851 F.3d 1244, 1247 (10th Cir. 1988) (reflecting ALJ's resolution of evidentiary conflicts between medical providers).

Here, the ALJ considered all relevant evidence and determined not to give Dr. Blackham's opinion—primarily found in an evaluation form Dr. Blackham completed at the request of Mr. Roberts—controlling weight. (*See* Tr. 23.) Mr. Roberts relies heavily on Dr. Blackham's evaluation form as proof of his disability, but Dr. Blackham refers only to "history, exam," to support his conclusions, (Tr. 474-477), rather than citing specific medical records. *See Griner v. Astrue,* 281 Fed.App'x. 797, 800 (10th Cir. 2008) (holding "'a treating physician's

14

report may be rejected if it is brief, conclusory and unsupported by medical evidence'" (quoting *Bernal v. Bowen,* 851 F.2d 297, 301 (10th Cir.1988)).  The ALJ proceeded to provide a thorough summary of the medical record that she found inconsistent with Dr. Blackham's opinion.  (Tr. 23.)  In particular, the ALJ found Dr. Blackham's own treatment notes "reveal chronic pain but no consistent symptoms of neurological compromise," thus undermining his opinions.  (*Id.*) Further, the ALJ found the majority of Dr. Blackham's conclusions in the evaluation form "out of proportion to [Mr. Roberts]'s physical, neurological and imaging examinations, and [Dr. Blackham's] own and his associates' treatment notes."  *Id.*  Therefore, the ALJ gave Dr. Blackham's opinion "considerably reduced weight."  *Id.*  However, the ALJ did not completely disregard Dr. Blackham's opinion.  The ALJ found the medical record supported Dr. Blackham's conclusions regarding necessary work restrictions "on unprotected heights, moving mechanical parts, rough or uneven surfaces, climbing stairs," and on providing Mr. Roberts "the option to change position from sitting to standing at will."  *Id.*  On that basis, the ALJ incorporated those restrictions into the assessment of Mr. Roberts's ability to work.  (Tr. 20-28.)  In making these findings, the ALJ makes clear her performance of steps one and two, allowing reviewers to follow her reasoning in according Dr. Blackham's opinion "considerably reduced weight."

By contrast to Dr. Blackham's opinion, the ALJ found Dr. Morrison's opinion "highly persuasive and [she] g[a]ve it considerable weight" because it is "well-supported by the medical records."  (Tr. 25.)  Unlike Dr. Blackham's evaluation form, Dr. Morrison cited specific medical records and treatment notes including those of Dr. Blackham that supported his opinion.  (Tr. 545-65.)  The Court will not reweigh the evidence presented to the agency or substitute its judgment for the Commissioner's.  *Lax,* 489 F.3d at 1084.  Therefore, on this record, the Court finds the ALJ's evaluation of the medical opinion evidence proper.

## II.     RFC Consideration

Mr. Roberts next argues the ALJ erred in assessing his RFC because she relies on Dr.

Morrison's opinion, which he claims does not support her finding and also does not contradict

Dr. Blackham's opinion, which she rejected.  (Pl.'s Opening Br. 12-13.)

The RFC reflects the ability to do physical, mental, and other work activities on a

sustained basis despite limitations from the claimant's impairments.  *See* 20 C.F.R. §§ 404.1545,

416.945.  In determining the claimant's RFC, the decision maker considers all of the claimant's

medically determinable impairments, including those considered not "severe."  *See* 20 C.F.R. §

404.1545(a)(2).  Case law and agency regulations state that "the ALJ, not a physician, is charged

with determining a claimant's RFC from the medical record."  *Howard v. Barnhart*, 379 F.3d

945, 949 (10th Cir. 2004) (following 20 C.F.R. § 416.927(e)(2) and SSR 96-5p).  *See also* 20

C.F.R. §§ 404.1546(c), 416.946(c).  Thus, even though Dr. Blackham made an RFC assessment,

the ALJ must make her own assessment and not simply defer her responsibility to the physician.

Moreover, the ALJ must base RFC assessments on all relevant evidence in the record, not just

the medical evidence.  20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3); SSR 96-8p.

Mr. Roberts's argument mischaracterizes the RFC and the evidence the ALJ used to

support her determination.  The ALJ found Mr. Roberts's RFC allows him to perform medium

work with significant exceptions:

> [F]requently  carrying  and lifting up to      10 pounds; a sit-stand option at will;
> avoiding all exposure to unprotected height s, to rough or uneven surfaces and to
> ladders, ropes and scaffolds: avoiding even  moderate exposure to climbing stairs;
> "occasional" (up to 1/3 of the workday)      exposure to m oving  mechanical  parts,
> operating  a motor vehicle and vibration;    and with "m ild" (slight limitation  but
> generally  able to function well) lim   itation in understanding, rem embering  and
> carrying  out detaile d  instructions, m aking  judgments  on com plex  work-related
> decisions,   interacting appropriately w    ith   supervisors and co-workers, and

responding  appropriately to usual work s  ituations  and to changes in the work
setting.

(Tr. 20.)  These exceptions reflect the evidence, including Dr. Morrison's and Dr. Blackham's

opinions, and place Mr. Roberts's RFC and occupational base somewhere between the medium

work level and light work level.  Ordinarily after determining a claimant's RFC the ALJ turns to

the medical-vocational guidelines (the "grids") to determine if claimant has a disability, and what

jobs he can perform.  20 C.F.R. pt. 404, Subpt. P, App. 2.  "The grids, however, 'may not be

applied conclusively in a given case unless the claimant's characteristics precisely match the

criteria of a particular rule.'"  *Casey v. Barnhart*, 76 Fed. App'x 908, 910 (10th Cir. 2003)

(quoting *Channel v. Heckler*, 747 F.2d 577, 579 (10th Cir. 1984)).  "Where the extent of erosion

of the occupational base is not clear, the adjudicator will need to consult a vocational resource."

SSR 83-12.

Mr. Roberts would have the Court believe Dr. Morrison's opinion contradicts the RFC,

(Pl.'s Reply Br. 7), but the ALJ quite clearly incorporated Dr. Morrison's findings as exceptions

to the standard medium work RFC she applied to Mr. Roberts's situation.  In addition to Dr.

Morrison's findings, the ALJ also relied on "certain portions" of Dr. Blackham's evaluation form

in determining the RFC, (Tr. 23), but the ALJ had no obligation to accept those portions of Dr.

Blackham's opinion she found inconsistent with other evidence.  In addition to the medical

opinions of Dr. Blackham and Dr. Morrison, the ALJ analyzed the actual medical records and

found many showed Mr. Roberts could not return to his job as a truck driver but did not

"preclude all work for all time."  (Tr. 22.)  The ALJ also relied on evidence showing a long

period of time where Mr. Roberts did not receive treatment for his back and that although he

complained of pain, his condition remained unchanged.  (*See* Tr. 24.)  Substantial evidence

supports this analysis by the ALJ of Mr. Roberts's condition and the RFC determination.

The ALJ's reasoning at step five also evidences her intent to have the RFC reflect the

limitations found in the record.  The ALJ consulted with a vocational expert at step five because

Mr. Roberts's ability to work "has been impeded by additional limitations," and she needed "[t]o

determine the extent to which these limitations erode the unskilled medium occupational base."

(Tr. 28.)  The vocational expert opined that Mr. Roberts could perform several unskilled, light

exertional level jobs, (Tr. 280-81.), a conclusion the ALJ found consistent with the RFC and the

other factors she had to consider at step five of the evaluation process.  (*See* Tr. 28.)  The ALJ's

use of a vocational expert as required by Social Security Ruling 83-12 provides further evidence

she recognized Mr. Roberts's RFC fell somewhere between the medium work and light work

category.

The Court finds the ALJ took into account Mr. Roberts's physical limitations and the

entire record in determining Mr. Roberts's RFC.  Substantial evidence in the record supports the

RFC finding, and the Court finds the ALJ did not err in assessing Mr. Roberts's RFC.

### III.    Listing of Impairments Consideration

Next, Mr. Roberts argues the ALJ erred at step three by finding he did not meet any

Listing of Impairments, specifically Listing sections 1.04 and 12.04, and that the ALJ's

reasoning was "confusing and inconsistent" and that she "[was] merely trying to cherry pick the

evidence to support her own conclusion." (Pl.'s Opening Br. 14-15.)

Appendix 1 of Subpart P, 20 Code of Federal Regulations section 404 lists impairments

that preclude "substantial gainful employment."  *See* 20 C.F.R. § 404.1520(d).  The claimant

bears the burden to show that his impairment meets or equals the requirements of a listed

impairment.  *See* 42 U.S.C. § 423(d)(5).  *See also Bowen,* 482 U.S. at 146; *Ray,* 865 F.2d at 224.

For an ALJ to find a claimant meets a listing, the claimant's impairment must "satisf[y] all of the

criteria of that listing, including any relevant criteria in the introduction, and meets the duration

requirement."  20 C.F.R. § 404.1525(c)(3).  If a claimant's impairment does not meet a listing,

his impairment may constitute the medical equivalent if he has "other findings related to [his]

impairment that are at least of equal medical significance to the required criteria."  20 C.F.R. §

404.1526(b)(1)(ii).  Where the claimant does not meet or equal a listing the ALJ must "discuss

the evidence and explain why [s]he found that [claimant] was not disabled at step three."  *Clifton*

*v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996).  But inadequate analysis at step three may

constitute harmless error if the "findings at other steps of the sequential process" support the

finding.  *Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005).

Mr. Roberts did not argue he met or equaled Listing 12.04 during the administrative

hearing.  Further, Mr. Roberts does not offer any explanation or evidence to support his

contention the ALJ erred by finding he did not meet Listing 12.04.  Nor does this Court find any

error in the ALJ's analysis regarding Listing 12.04.  Accordingly, the Court will not address this

argument.

Regarding Listing 1.04, the ALJ found Mr. Roberts did not meet the Listing because he

"did not have the requisite pseudoclaudication, arachnoiditis, or consistent signs of spinal

compression."  (Tr. 20.)  Mr. Roberts does not provide any evidence to refute this conclusion

except for referring to Dr. Blackham's opinion, (Pl.'s Reply Br. 8-10), which the ALJ refutes

with reference to substantial evidence throughout her opinion.  (Tr. 20-24.)  The ALJ also found

that although Mr. Roberts may have met Listing 1.04 near the time of his two surgeries in

February and April 2007, he did not meet the durational requirement.  (Tr. 19.)  The ALJ bases

her conclusion on Dr. Morrison's opinion, and although Dr. Morrison does not provide specific

dates when Mr. Roberts met Listing 1.04, he does clearly state Mr. Roberts did not meet the

criteria "for the full year period." (Tr. 547.) Dr. Morrison supports his conclusion by attaching a

completed "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" that

cites medical evidence. (*See* Tr. 549, 559-565.) The parties dispute whether the ALJ came to a

similar conclusion during the administrative hearing. (Tr. 64-5.) Regardless, the ALJ bases her

final determination on Dr. Morrison's opinion, which she received after the administrative

hearing. [11]

Further, although the ALJ's analysis at step three appears somewhat conclusory in that

she relies on Dr. Morrison's opinion without discussing specific medical records, her analysis at

steps four and five, previously discussed in this opinion, support her conclusion that Mr. Roberts

did not meet Listing 1.04. Specifically, the ALJ notes the MRIs show solid fusions with "no

acute complications or significant abnormality." (Tr. 21.) Further, Dr. Blackham's records

reflect periods of "doing well" (January 2008 through June 2008) including no need for narcotic

medication. [12] (Tr. 22.) Because Mr. Roberts does not meet his burden of proving his conditions

meet or equal a listing and because the ALJ's opinion as a whole supports her determination at

step three, the Court finds the ALJ did not err in finding Mr. Roberts did not meet or equal

Listing 1.04.

---

[11] Additionally, after m aking the disputed preliminary finding during the adm inistrative hearing, the ALJ doubted her finding later in the hearing because of insufficient medical records on which to base her decision. (Tr. 72-73.)

[12] Furthermore, medical records between January 11, 2008, and June 9, 2009, show Mr. Roberts's physical condition was inconsistent, specifically his rang e of m otion, reflexes, sensation in his legs, and straig ht leg raise tests, and therefor e he did not m eet the durational requirement. (*See* Tr. 491-92, 494-95, 521, 524, 527-28, 530-31, 536, 569, 572.)

#### IV.    Evaluation of Other Medical Source Opinion Evidence

Lastly, Mr. Roberts argues the ALJ erred because she rejected the opinion of David B. Jensen, Mr. Roberts's mental health caseworker, and did not explain the weight she afforded Mr. Jensen's opinion.  (Pl.'s Opening Br. 15.)  In addition to medical opinions from "acceptable medical sources" an ALJ must consider any other relevant evidence to determine if a person qualifies as disabled.  SSR 06-03P.  Relevant evidence may come from "other sources" who are not "acceptable medical sources," and the ALJ can evaluate them using the same factors used to evaluate medical evidence from "acceptable medical sources," *Id.*, which the Court has already set forth in this opinion.  Evidence "from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source.'"  *Id.*  While a clear statement by the ALJ explaining the weight she gave to opinions from "other sources" assists the Court in its review, the ALJ need only "ensure that the discussion of the evidence in the . . . decision allows a . . . subsequent reviewer to follow the [ALJ]'s reasoning."  *Id.*

Mr. Roberts's argument incorrectly asserts the ALJ discounted Mr. Jensen's opinion solely on the basis that "Mr. Jensen is not an acceptable medical source."  (Pl.'s Opening Br. 15.)  In addition to considering Mr. Jensen's status as an "other medical source," the ALJ found Mr. Jensen's "opinion was not well-supported by his or any other medical records."  (Tr. 26.)  Mr. Jensen's opinion does not cite his clinical notes or any other medical evidence, and Mr. Jensen failed to provide clinical notes or other evidence to support his conclusions.  (*Id.*)  Further, the ALJ determined that she could not consider the Global Assessment of Functioning ("GAF") scores provided by Mr. Jensen because the "GAF score is not designed for adjudicative purposes" and "standing alone, is not informative."  (Tr. 25.)

21

Moreover, medical evidence fails to support Mr. Jensen's opinion.  In March 2007, Dr. Blackham found Mr. Roberts depressed following the first surgery.  (Tr. 447.)  But on December 2007, however, Dr. George noted "[h]e appears to be functioning much better in relation to his depressive symptoms," (Tr. 488), and on January 10, 2008, Mr. Roberts requested an increase in antidepressants, reported going to therapy, and feeling better.  (Tr. 538.)  These symptoms make no further appearance in the record until June 30, 2009, and Mr. Roberts reports depression at the time without any further explanation.  (*See* Tr. 566.)  Therefore, the ALJ did not err in finding Mr. Jensen's opinion should receive less weight than the other medical evidence and interrogatories on the record.

## CONCLUSION

Based on the foregoing, the Court finds that substantial evidence supports the Commissioner's decision and AFFIRMS the Commissioner's decision in this case.

DATED this 13th day of March, 2013.

BY THE COURT:

_____
Evelyn J. Furse
United States Magistrate Judge